**William P. YOUNG, Plaintiff,**

v.

**LUMENIS, INC., Defendant.**

No. 2:03–CV–655.

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 19, 2004.

See also 301 F.Supp.2d 765.

Jason H. Foster, Kremblas, Foster, Phillips & Pollick, Reynoldsburg, OH, for Plaintiff.

Christopher Craig Woods, Squire Sanders & Dempsey, Columbus, OH, Gregory J. Fleesler, Michael J. Pospis, Stephen N. Weiss, Moses & Singer, LP, New York City, for defendant.

## *OPINION AND ORDER*

MARBLEY, District Judge.

### I. INTRODUCTION

This patent infringement action is before the Court following a hearing held on September 7 and 8, 2004, on the issue of inequitable conduct. Defendant, Lumenis, Inc. ("Lumenis"), claims that Plaintiff, William P. Young, and his Counsel, Jason

Foster, engaged in inequitable conduct before the United States Patent and Trademark Office ("PTO") and that such conduct renders Plaintiff's patent unenforceable. Based on the evidence presented at the hearing and the applicable law, the Court **FINDS** that neither Young nor Foster engaged in any inequitable conduct before the PTO.

## II. BACKGROUND

Plaintiff, a veterinarian, has obtained a patent for a cat declaw method using a laser. U.S. Patent No. 6,502,579 (the "'579 patent"), entitled "Laser Onychectomy by Resection of the Redundant Epithelium of the Ungual Crest," was awarded to Plaintiff on January 7, 2003. In a Complaint filed on July 23, 2003, Plaintiff sought preliminary and permanent injunctions, damages, and attorney's fees based on Defendant's alleged infringement of the '579 patent. According to Plaintiff, Lumenis, a manufacturer of lasers used in veterinary surgery, had been teaching veterinarians to perform the patented procedure in connection with its sales efforts.

By Opinion and Order dated January 26, 2004, the Court granted Plaintiff's Motion for Preliminary Injunction. Finding that Defendant had not raised a substantial question as to the patent's validity and that Plaintiff had a reasonable likelihood of success on the merits of his infringement claim, the Court enjoined Defendant and anyone acting in concert with Defendant from teaching, performing, or practicing the patented procedure and from distributing any materials that teach or illustrate the procedure.

On May 25, 2004, Defendant filed an Amended Answer in which it raised, as both an Affirmative Defense and a Counterclaim for Declaratory Judgment, the issue of inequitable conduct. According to Defendant, Young and Foster (collectively, "Applicants") engaged in inequitable conduct in the following ways: (1) by failing to disclose to the PTO Young's commercial use and/or sale of the patented invention more than one year before the patent application date; (2) by misrepresenting the prior art in the patent application due to their failure to disclose the existence of the dissection method of cat declaw; (3) by omitting the "Slatter reference" from their Petition to Make Special ("PTMS"); (4) by failing to provide the "Geller reference" to the PTO; and (5) by failing to provide the "Luxar reference" to the PTO.

Applicants argue that there was no commercial use and/or sale of the patented invention, rendering such disclosure unnecessary. Applicants also contend that the patent application did not misrepresent the prior art. With respect to any omissions, Applicants assert that the omitted references either were not material or, even if they were material, were not omitted with an intent to deceive the PTO.

The Court conducted a bench trial on the inequitable conduct issue on September 7 and 8, 2004. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.

## III. STANDARD OF REVIEW

In order to prove inequitable conduct in the prosecution of a patent, the party alleging inequitable conduct must provide evidence of "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed.Cir.2003) (quoting *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1366 (Fed.Cir. 2001)). "Both intent and materiality are questions of fact that must be proven by clear and convincing evidence." *Dayco,*

329 F.3d at 1362; *see Monsanto Co. v. Bayer Bioscience N.V.,* 363 F.3d 1235, 1239 (Fed.Cir.2004) (noting that a court may only find a patent unenforceable based upon inequitable conduct if it finds, by clear and convincing evidence, "that the applicant omitted or misrepresented material facts with the intention of misleading or deceiving the patent examiner"); *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,* 204 F.3d 1368, 1373 (Fed.Cir. 2000) (stating that alleged infringer "must demonstrate by clear and convincing evidence both that the information was material and that the conduct was intended to deceive").

■ The court first must determine whether the withheld references or misrepresentations satisfy a threshold level of materiality and whether the applicant's conduct satisfies a threshold showing of intent to deceive. *Semiconductor,* 204 F.3d at 1373; *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327 (Fed.Cir.1998). Once the threshold levels of materiality and intent have been established, the court must weigh materiality and intent to determine whether the equities warrant the conclusion that inequitable conduct occurred. *Semiconductor,* 204 F.3d at 1373; *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed. Cir.1997); *see Monsanto,* 363 F.3d at 1239 ("Once the challenger has shown the requisite levels of materiality and intent, the district court must balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable."). "The more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has oc-

curred." *Baxter,* 149 F.3d at 1327; *accord Critikon,* 120 F.3d at 1256. "In light of all the circumstances, the court then must determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Baxter,* 149 F.3d at 1327; *accord Semiconductor,* 204 F.3d at 1373 (noting that determination is an "equitable judgment").

Rule 56 of the PTO regulations defines materiality as follows:

[I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (2004).[1] "A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features

---

1. Defendant has cited this Court to the wrong legal standard. Defendant would have this Court apply the "reasonable examiner" standard of materiality, a standard that was found in the previous version of Rule 56. This out-

dated standard has not been applied by the Federal Circuit in any case involving a patent prosecuted after January 17, 1992, the date of the rule change. *Dayco,* 329 F.3d at 1364.

are before the patent examiner in other references." *Semiconductor*, 204 F.3d at 1374.

■ Direct evidence of intent is rarely available in instances of inequitable conduct, but intent may be inferred from clear and convincing evidence of the surrounding circumstances. *Baxter*, 149 F.3d at 1329; *Critikon*, 120 F.3d at 1256; *see Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed.Cir.1995) (stating that intent "is most often proven by a showing of acts, the natural consequence of which are presumably intended by the actor"). "[A]lthough intent may be inferred from circumstantial evidence, mere gross negligence is insufficient to justify an inference of an intent to deceive the PTO." *Baxter*, 149 F.3d at 1329; *accord Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed.Cir.2002) (citing *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988) (en banc in relevant part)). "In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference." *Baxter*, 149 F.3d at 1329.

While intent sometimes may be inferred from misleading conduct itself, *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1191 (Fed.Cir.1993), the Federal Circuit has noted that "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed.Cir. 1988). Proof of high materiality and that the applicant knew or should have known of that materiality, however, can make it difficult for an applicant to overcome an inference of intent to mislead:

> No single factor or combination of factors can be said always to require an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*Critikon*, 120 F.3d at 1257; *see Semiconductor*, 204 F.3d at 1375.

## IV. ANALYSIS

### A. Commercial Use or Sale

Defendant contends that Plaintiff knew, while his patent application was pending, that he had used part or all of his alleged invention commercially more than one year before the patent application date. Defendant asserts that Applicants' failure to disclose this prior commercial use to the PTO amounts to inequitable conduct. Plaintiff counters that any pre-critical date sales of his invention were experimental rather than commercial and that he thus had no duty to disclose those sales to the PTO. Defendant claims that Plaintiff, throughout these proceedings, has testified inconsistently regarding the dates of his development and first commercial use of his alleged invention. Defendant argues that these shifting dates provide persuasive evidence of Applicants' intent to mislead the PTO.

#### 1. Findings of Fact

Plaintiff's provisional patent application was filed on January 19, 2000. The critical date, for purposes of the on-sale bar set forth in 35 U.S.C. § 102(b), is thus January 19, 1999. At his deposition, Young testified as follows:

> Q. Now, there came a time when you state you invented a new procedure for declaw; correct?

A. Right.

Q. How did you come about that?

A. I was very dissatisfied with what I had been taught and what I had seen at seminars.

Q. So what did you do?

A. I tried to figure out a better way to do it.

Q. How did you do that?

A. Well, I surmised that the only way to get a smaller incision was to leave more skin, so I started trying to leave more skin.

Q. How did you do that?

A. It took me quite awhile. Exactly how I did it, I can't tell you, other than I incised further and further down the nail in different directions, up and down and sideways, and finally arrived at the way I thought I could save the most skin.

Q. How long did that take you to figure this out?

A. I'm not sure.

Q. Approximately?

A. Couple months.

Q. Couple of months of experimentation with the laser?

A. Well, yes.

Q. Did you take any notes as you were doing this experimentation?

A. No.

. . . . .

Q. Where did you do this experimentation?

A. In my office.

Q. Did you do it on other people's pets?

A. Some.

Q. Did you tell them you were doing an experimental procedure?

A. No.

Q. Did you charge them for it?

A. At times.

Q. Did you make any notes or memorandum on their charts or bills or anything to show that you did this?

A. No.

Q. None, whatsoever?

A. No.

Q. So all we have to know about that is your word; correct?

A. Absolutely.

Q. Okay.

Now, how long did it take you from the time you started experimenting until you feel that you had your invention complete?

A. "Complete" to me, is that in theory or when I could walk in the surgery room and do it in 10 minutes?

Q. When you felt that you understood your invention well enough to explain it to someone else.

A. The fall of '98.

Q. How long were you experimenting to do that?

A. A couple of months.

Q. And why do you say fall of '98?

A. Because that's when I recall.

Q. Based upon what?

A. My memory.

Q. Anything else?

A. Just I recall when I did it.

Q. Did there ever come a time when you wrote down your procedure?

A. Yes.

Q. When was that, the first time?

A. Probably when Dr. Bartels asked for a call for papers.

Q. And what time?

A. I want to say May of '99.

At trial, Young testified, as if on cross-examination, in Defendant's case-in-chief. Regarding the alleged prior use, Young's testimony was as follows:

Q Let me call your attention to some time before you filed your application for what became the '579 patent, particularly in the fall of 1998. Some time in the fall of 1998, did you not use your patented procedure in your office on cats belonging to your clients?

A Probably not.

Defendant's Counsel proceeded to impeach Young with his deposition testimony.

During Plaintiff's case-in-chief, Young testified as follows:

Q. Dr. Young, you mentioned in your testimony earlier that you received a copy of what we have been referring to as the Luxar reference when you received your laser, is that correct?

A. That's correct.

Q. Do you have any idea timing-wise when that was?

A. March of '98.

. . . . .

Q. When was it about the time that you became dissatisfied with [the declaw process described in the Luxar reference]? Was it right away or sometime later?

A. No, it took a few months. I probably went through the summer, you know, saying, well, maybe my technique is not good. And as with all people, you get better as you do things more and more. So I was sure my technique was good. And I just became dissatisfied that this tool was not being utilized to its best end.

Q. And then what did you do next after you became dissatisfied in roughly summer of '98?

A. Well, I think, sometime towards the fall of '98, I remember amputating a bulldog's front leg, it had gotten into an argument with a lawn mower, and I thought to myself, well, I have to make sure I have enough skin to close this stump. .... And I thought to

myself, there is a little skin on that claw. Why don't I try that?

Q. You said that was in the fall of '98?

A. Yes.

Q. So from the summer of '98 until the fall of '98, do you remember what you did?

A. No, I mean I kind of—I think I tried a few different methods, but it really didn't hit me until the fall what I really wanted to do, what I needed to do.

Q. Now you testified, didn't you, in your deposition, that the fall of '98 was when you could explain your procedure to someone else, didn't you?

A. Yes.

Q. .... What did you mean by that?

A. I knew what I needed to do. I knew if I could excise that skin on the end of the claw and utilize it, that's what I want to do.

Now, no, I didn't have the steps. Did I know what would work? No. I mean if I—as you saw in one of those pictures where the flap was up, what would happen if this skin would devitalize after a month or two? I didn't know how that would heal. I didn't know if that thing would invaginate and cause some folliculitis. I had no idea. So I started with incising in different areas.

But this is something I want to make very clear because it bothers me, and it may not be related to the subject matter, but when people say experimentation, I always knew that whatever I did lower than the PII–PIII joint, I could always amputate it at the PII–PIII junction, just like Luxar, and I would be doing at least the standard for declaws.

Q. When you say lower, again, toward the pointy end of the claw?

A. Yes. If I didn't like what I was resecting of the redundant epithelial tissue, my patient would not suffer any different than if I had done a Luxar laser onychectomy.

Q. So kind of summarizing what I think you said, you could always cut toward the tip of the claw. But if you didn't like the results, you could always go back to what you have described as the Luxar procedure?

A. And frequently that's what I did. I would try something new and say, I don't know if the skin is going to make it on that one. Let's go ahead and do our normal declaw. Okay? And we might have to close it, or we might leave it open. It just depends.

. . . . .

Q. If in the fall of '98 you came up with this idea, what did you do after that?

A. Well, that's pretty much when I started, I guess as lawyers would call, experimentation. And, again, it was trying different methods, trying ways to do what I knew I wanted to do. And that probably continued for several months. And I know that I did not get down to the last steps until winter, as far as I can remember. And I remember putting the whole thing together sometime in January. It was an evolutionary process because I would try one thing. I would use the circumferential incision, but maybe I didn't quite have the rotation of the pad down. So it took a while to put that all in the proper sequence in order to effect what I wanted to do. Also, to see it back from the patients and to make sure, hey, what you are doing is okay. Or, you need to start all over because that doesn't look good.

Q. What do you mean see it back?

A. Those cats needed to heal, and I needed to see them back and inspect their paws and look for these things like folliculitis or look for the invagination or look for something that wasn't right.

Q. Now was there a time that you became satisfied that the procedure was a success or worked as you wanted it to?

A. I think it was very clear to me that in January, that this was going to work.

Q. And what did you do once you decided that?

A. Well, I had this—I want to make sure what I do for my patients is going to be the best possible. And when I decided that this was going to be it, I started using it exclusively probably at the end of January, maybe, you know, I can't say for sure, but I do know that it was sometime around my birthday that I decided, hey, that's not bad. Why don't you use that.

Q. When is your birthday?

A. January 23.

The evidence reveals that Young was experimenting with the procedure between the summer of 1998 and January of 1999. Young appears to have intermixed the patented procedure, or aspects of the patented procedure, with the standard declaw procedure during his period of experimentation. While Young charged clients for the onychectomies he performed, there is no evidence that he differentiated his fee based on which type of procedure he performed. Defendant provided no additional evidence of commercial exploitation prior to the critical date. Young testified that he finalized the procedure around the end of January; Defendant provided no evidence to the contrary.

## 2. Conclusions of Law

■ A patent is invalid if "the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). In order to be subject to the on-sale bar, the item sold must be "both (1) the subject of a commercial offer for sale not primarily for purposes of experimentation and (2) ready for patenting." *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1352 (Fed. Cir.2002) (citing *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998)); *see also Petrolite Corp. v. Baker Hughes Inc.,* 96 F.3d 1423, 1426 (Fed.Cir.1996) (stating that otherwise public use or sale will not invalidate patent if activity was "substantially for purposes of experiment") (quoting *Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494, 498 (Fed.Cir.1992)); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1185 (Fed.Cir.1993) ("Under long standing judicial interpretation, a product embodying the patented invention, which is sold or offered for sale more than a year before the application's filing date, may escape the statutory bar where such sale was primarily for a bona fide experimental purpose to perfect the invention, rather than for commercial exploitation."); *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 550 (Fed.Cir.1990) ("[A] sale that is primarily for experimental purposes, as opposed to commercial exploitation, does not raise an on sale bar...."); *U.S. Envtl. Prods., Inc. v. Westall,* 911 F.2d 713, 716 (Fed.Cir.1990) ("A section 102(b) bar is avoided if the primary purpose of the sale was experimental....").

With regard to the first prong of the *Pfaff* test, the Federal Circuit has opined that the relevant question is not whether the invention was in the experimental stage but, rather, "whether the transaction constituting the sale was 'not incidental to the primary purpose of experimentation,' i.e., whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." *EZ Dock v. Schafer Sys., Inc.,* 276 F.3d 1347, 1357 (Fed.Cir.2002) (quoting *Scaltech, Inc. v. Retec/Tetra L.L.C.,* 178 F.3d 1378, 1384 n. 1 (Fed.Cir.1999)). The second prong of the test may be satisfied "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff,* 525 U.S. at 67–68, 119 S.Ct. 304.

■ Considering the second prong first, the Court finds that Defendant has not established, by clear and convincing evidence, that Young's procedure was ready for patenting prior to the critical date. Young provided cogent and credible evidence that the procedure was not finalized until after he had both perfected the steps and monitored the healing process. Young's testimony that he was satisfied with the procedure sometime around January 23, 1999, while hardly a model of clarity, was not controverted by any evidence. Defendant's argument to the contrary is based solely upon an inference that because Young allegedly changed this date throughout the course of these proceedings and because the date of January 23, 1999, is suspiciously close to the critical date, Young must be lying. The Court does not find an inherent contradiction between Plaintiff's deposition testimony and his trial testimony on this issue. While Defendant's inference might suffice to meet a preponderance of the evidence standard or to convince a jury of this point, Defendant has not demonstrated by

clear and convincing evidence—or, indeed, by any evidence—that Young had finalized his procedure prior to January 19, 1999.

The next question is whether any use or sale of the patented procedure prior to the critical date was "primarily for purposes of experimentation." *Allen,* 299 F.3d at 1352. Again, Defendant has not established, by clear and convincing evidence, that, in collecting fees for his services in declawing cats during the experimentation period, Young was motivated primarily by commercial exploitation rather than by the desire to experiment. There has been absolutely no evidence, nor even any argument, that Young was commercially exploiting *his invention* prior to January 19, 1999. The policies underlying the on-sale bar include "prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time." *Tone Bros. v. Sysco Corp.,* 28 F.3d 1192, 1198 (Fed.Cir.1994). Young inarguably did not profit from his invention prior to the critical date: he did not seek to license or sell his procedure, and he did not charge his customers more for the provision of the "new and improved" cat declaw. Young experimented in the context in which it would make sense for him to do so: in the course of his normal veterinary practice. Defendant has failed to prove that Young had a non-experimental purpose for his activity prior to the critical date.

█ Because Defendant has not established, by clear and convincing evidence, that Plaintiff's prior use could render the '579 patent invalid pursuant to § 102(b), Defendant has failed to establish, by the requisite clear and convincing evidence, that Plaintiff's prior use was material to patentability. *See* 37 C.F.R. § 1.56(b) (2004) (defining information as material if it "compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard"). Giv-

en the duty of candor, good faith, and honesty that a patent applicant assumes, 37 C.F.R. § 1.56(a) (2004), Applicants arguably should have disclosed Plaintiff's prior use. Because the Court is not convinced that the information was material, however, the Court cannot find inequitable conduct based on Applicants' failure to make such disclosure. Furthermore, even if the information were material, its low materiality, coupled with the absence of substantial evidence of deceptive intent, still would not warrant a finding of inequitable conduct.

### B. Representation of Prior Art

Defendant asserts that there are two basic methods for performing a feline onychectomy: the "guillotine" method, which entails merely clipping off the claw, and the "dissection" method, which entails separately cutting, in discrete steps, each piece of tissue connecting the claw to the digit. Defendant contends that Applicants intentionally deceived the PTO in their description of the prior art in the patent application by only discussing the guillotine method and failing to mention the dissection method. Plaintiff contends that there is no evidence that there are only two onychectomy techniques or that reference to those techniques must be made by the talismanic terms "guillotine" and "dissection." Plaintiff further asserts that the description of the prior art contained in his patent application was sufficiently clear that a person of ordinary skill would understand it.

#### 1. Findings of Fact

The '579 patent application described the prior art as follows:

Onychectomy is the disarticulation and removal of the third phalanx in cats. Conventionally, onychectomy has been performed using mechanical cutting instruments, such as scalpels and clippers,

to sever the skin, ligaments, tendons, and synovium at the PII–PIII joint. The instruments mechanically sever all of the tissue along a transverse plane passing between the second and third phalanges (PII–PIII) in the manner of a guillotine. Conventional onychectomy procedures cause complications due to the nature of the instruments used. The complications are hemorrhage, pain, swelling and tissue deficit due to removal of PIII. The tissue deficit is generally closed with sutures or tissue adhesives.

The complications of hemorrhage, pain and swelling have been reduced with the introduction of the $CO_2$ surgical laser. Exposure of the laser beam to tissue excites water molecules within tissue cells. The energy of the laser vaporizes the water in the cells and thereby ruptures the cells. The laser causes minimal damage to adjacent cells due to the fact that the beam is so narrow. Vaporization of cells coagulates small blood vessels and resects nerves with minimal trauma.

Although laser onychectomy reduces hemorrhaging, pain and swelling, traditional laser techniques retain the guillotine-oriented cutting path, thereby resulting in tissue deficit at the site where the third phalanx is removed. This deficit necessitates epidermal closure to cover the surgical site. As previously stated, this involves suturing the epidermis or closing it with tissue adhesive. Frequently no closure is used and the deficit closes by secondary intention resulting in delayed healing and the increased possibility of infection.

Defendant objects to the phrases "in the manner of a guillotine" and "guillotine-oriented cutting path," arguing that the use of those phrases represents a calculated attempt to mislead the patent examiner into believing that the prior art includes only the "guillotine method" and not the "dissection method."

Dr. Dennis Olsen, Defendant's technical expert, testified that there are two methods for declawing a cat. The guillotine method, commonly performed using a Resco nail trimmer, involves a single stroke cut through all of the connective tissue between PII and PIII. The dissection method, performed using either a scalpel or laser, involves cutting the various connective tissues in discrete steps. All witnesses agree that neither a scalpel nor a laser may be used to perform the guillotine technique. On cross-examination, Olsen admitted that there are many other names for these two techniques and that there are many combinations of the two techniques. For example, the word "disarticulation," which Applicants used in the prior art description, is essentially a synonym for "dissection."

Both Young and Foster testified that their intent in using the phrases "in the manner of a guillotine" and "guillotine-oriented cutting path" was not to refer to the guillotine/nail clipper method of declaw but, rather, to describe a characteristic of all prior art procedures—that they call for a cut along one cutting path and therefore fail to preserve tissue in the way that the patented procedure, with two separate cutting paths, prevents tissue deficit.

### 2. Conclusions of Law

■ Applicants' prior art description reasonably may be read as referring to the prior art's single-plane cutting path rather than solely to the guillotine method of declaw. The Court will not hold Plaintiff's patent unenforceable merely because he used the word "guillotine" yet failed to use the word "dissection." Such precise incantations are not required under the circumstances. As Defendant's own expert testified, there are various declaw methods, and numerous names may be used to refer to those methods. Indeed, a person of ordinary skill in the art likely would un-

derstand Applicants' description not to refer solely to the guillotine method because neither scalpels nor lasers may be used to perform the guillotine technique. While Applicants' unfortunate choice of words leaves the description open to the sort of interpretation urged by Defendant, Defendant has not established by clear and convincing evidence that any misleading or omitted language is material. A jury conceivably could find that the prior art description is inconsistent with an argument made by Applicants in asserting patentability; however, the Court does not believe that such is the clear import of Applicants' language. Furthermore, even if Defendant had established some low level of materiality, there is no persuasive evidence of a high level of intent. The Court therefore declines to find inequitable conduct based upon Applicants' description of the prior art.

### C. Slatter Reference in PTMS

Defendant contends that Applicants engaged in inequitable conduct by failing to distinguish the Slatter 1985 reference in their Petition to Make Special. Defendant asserts that even though Applicants had disclosed the Slatter 1985 reference to the PTO in their patent application, they had an obligation to discuss that reference in their PTMS. Plaintiff argues that the Manual of Patent Examining Procedures ("MPEP"), when properly interpreted, does not require the disclosure or discussion in a PTMS of a previously disclosed reference. Because the failure to discuss Slatter 1985 resulted from following proper procedures or, at most, resulted from a reasonable difference in interpretation of the MPEP, Plaintiff asserts that there was no intent to deceive the PTO and hence can be no inequitable conduct.

**2.** These patents are entitled "Topically Applied Clotting Material," "Artificial Nail and Implantation Techniques," "Laser Manicure

### 1. Findings of Fact

The one piece of scholarly material cited in the '579 patent application was a book, *Textbook of Small Animal Surgery*, written by Donald H. Slatter and published in 1985, which contains a brief passage on feline onychectomy (the "Slatter 1985 reference"). Approximately one month after filing the patent application, Applicants filed a PTMS. In the PTMS, Applicants discussed four existing patents that have only tenuous connections to the '579 patent.[2] Applicants did not discuss or even mention the Slatter 1985 reference in their PTMS.

### 2. Conclusions of Law

 The purpose of a PTMS is to advance a patent application for examination out of turn. 37 C.F.R. § 1.102(a) (2004). In exchange for the grant of accelerated examination, an applicant is required to certify that a prior art examination has been made. MPEP § 708.02.VIII (2004); *see Gen. Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed.Cir. 1994) ("The whole point of the PTO requirement that a petition to make special include a sworn statement that the applicant has made a careful and thorough search is that, in return for an applicant being put at the head of the examining line, he must make an extra effort to look for and produce all relevant prior art, in other words, to assist an examiner who is being asked to expedite examination."). The MPEP also requires an applicant for a PTMS to take the following steps:

(D) Submit[ ] one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record; and

Process," and "Laser Dermablator and Dermablation."

(E) Submit[ ] a detailed discussion of the references, which discussion points out, with the particularity required by 37 CFR 1.111(b) and (c), how the claimed subject matter is patentable over the references.

MPEP § 708.02.VIII.

Plaintiff's argument is that he did not disclose the Slatter reference in his PTMS because it was "already of record," having been disclosed in the original patent application. MPEP § 708.02.VIII(D). Defendant, in response, asserts that Plaintiff did not comply with MPEP § 708.02.VIII(E). The dispute is whether the term "the references" in § 708.02.VIII(E) refers to all relevant references or refers only to the relevant references that "are not already of record," MPEP § 708.02.VIII(D). Defendant contends that Applicants' reading of the rule is nonsensical because it allows them to avoid a discussion of the most relevant prior art reference. Applicants contend that, even if their interpretation of the rule is incorrect, there can be no intent to deceive because they made no attempt to hide the Slatter 1985 reference; indeed, they had voluntarily disclosed it only a month prior.

The Court need not decide which interpretation of § 708.02.VIII is correct. Both interpretations are colorable. The Court accordingly is unable to discern any intent to deceive. Certainly, Defendant has not demonstrated the existence of any deceptive or manipulative intent by clear and convincing evidence. Applicants did not attempt to conceal the existence of the Slatter 1985 reference; rather, they had reason to believe that the patent examiner would consider that reference before making any decision since the reference was included in the application materials. Because the intent element is lacking, Defendant has failed to establish that Applicants' failure to discuss the Slatter 1985 reference in the PTMS amounts to inequitable conduct.

### D. Geller Reference

Defendant contends that Applicants possessed, understood, and intentionally withheld from the PTO the Geller reference. According to Defendant, the Geller reference is material both because of its own content, which includes a discussion of both the dissection and guillotine methods of cat declaw, and because it cites to two additional material prior art publications. Plaintiff counters that neither Young nor Foster was aware of the Geller reference. Plaintiff further argues that the Geller reference is not material because its content is cumulative and because the mere fact that it cites to additional references in footnotes does not render it material.

### 1. Findings of Fact

The article "Doing it Right: Feline Onychectomy," by Jon Geller, was published in the October 1999 issue of the journal *Veterinary Technician* (the "Geller reference"). Applicants did not ever disclose the Geller reference to the PTO. Young testified that, even though he possessed, in his office, the magazine containing the Geller reference, he was not aware of the Geller reference until after the commencement of this litigation. Young stated that there are always stacks of magazines in his office that he retains for later viewing and that the October 1999 *Veterinary Technician* must have been among those stacks.

On January 18, 2001, Applicants filed an application pursuant to the Patent Cooperation Treaty ("PCT"). Foster testified that the purpose of filing a PCT application is to preserve an inventor's right to obtain patents in the foreign countries covered by the PCT. According to Foster, by filing a PCT application, an inventor can, with minimal expense, essentially buy himself time to consider whether to continue with the international examination process

and/or to file patent applications in any foreign country. On July 26, 2001, the International Bureau of the World Intellectual Property Organization mailed a packet of materials to Foster. The packet included three things: (1) a notice of the publication of Applicants' PCT application; (2) a copy of the published version of Applicants' PCT application; and (3) an international search report.

The international search report, contained on the last page of the mailing, lists the Geller reference under "DOCUMENTS CONSIDERED TO BE RELEVANT." The PTO official who conducted the international search categorized the Geller reference as a "document defining the general state of the art which is not considered to be of particular relevance." Among the categorical options not selected by the PTO officer for the Geller reference were the following: (1) "document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason"; (2) "document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone"; and (3) "document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art."

Foster has no specific recollection of receiving or reviewing the materials sent by the International Bureau on July 26, 2001. Based on his knowledge of the procedures normally followed in his office and on the notes in Young's PCT application file, however, Foster is able to reconstruct the probable sequence of events. On August 10, 2001, Young communicated to Foster his desire to abandon the PCT application. On August 9, 2001, Foster's office had sent to Young a letter informing Young of the receipt of the PCT materials. Foster testified that such a letter usually would be mailed by his secretary on the day the materials arrived. The PCT materials then would have reached Foster's attention a few days later. Foster thus likely reviewed the PCT materials at approximately the same time that, or shortly after, Young instructed him to abandon the PCT application. Foster, therefore, likely gave the materials no more than a cursory glance and may or may not have noticed the citation to the Geller reference. Foster has no recollection of ever having requested a copy of or reviewed the Geller article itself prior to this litigation.

## 2. Conclusions of Law

■ Defendant has provided no more than conclusory inferences to support its assertion that either Young or Foster was aware of (1) the existence of the Geller reference; (2) the contents of the Geller reference; or (3) the materiality, if any, of the Geller reference. Without the establishment of such basic facts, Defendant cannot prove intent. *See FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 (Fed. Cir.1987) (stating that one who alleges a failure to disclose form of inequitable conduct must offer clear and convincing proof of "knowledge chargeable to applicant of that prior art or information and of its materiality") (footnote omitted). Defendant has failed to prove by clear and convincing evidence that Applicants had such knowledge. The circumstances also are not sufficiently suspicious to raise a persuasive inference that Applicants' failure to disclose the Geller reference was the result of an intent to deceive the PTO.

■ Additionally, the Court is not convinced that a document categorized by the PTO as "not ... of particular relevance" should nonetheless be considered material under Rule 56. According to Defendant's own patent law expert, Professor John R.

Thomas, an applicant would have no duty to read the references cited in an article, though it would be good practice to do so. Logically, the materiality of an article thus should be based on the contents of the article itself, not on the contents of the articles it cites. Defendant's remaining argument regarding the materiality of the Geller reference appears to be based on the fact that the Geller reference discusses two techniques of performing a feline onychectomy: the guillotine method and the dissection method. As the Court already has held, however, Applicants' description of the prior art is not necessarily inconsistent with such a discussion. Defendant has not established, by clear and convincing evidence, that the Geller reference is material.

Because Defendant has not established either materiality or intent, there can be no inequitable conduct based on failure to disclose the Geller reference. Even if one or the other element had been proven, however, the level of materiality and level of intent would both be so low that this Court would decline to find inequitable conduct.

### E. Luxar Reference

Defendant contends that Young unquestionably was aware of the Luxar reference and that the Luxar reference unquestionably is material. According to Defendant, the Luxar reference is material because it (1) like the '579 patent, discloses a method of performing a feline onychectomy using a surgical laser; (2) inspired Young to develop his invention; (3) disclosed, at the time Young received it, the only known laser feline onychectomy technique; and (4) contains figures that are strikingly similar to those used in the '579 patent. Plaintiff argues that Young was aware of the Luxar reference, but he discussed the substance of the Luxar reference with Foster and believed that substance to be included in the prior art discussion in the patent. Plaintiff asserts that the Luxar reference is cumulative and that it would not support a prima facie case of unpatentability because there are numerous parts of the patented procedure that the Luxar reference does not disclose.

### 1. Findings of Fact

When Young took possession of his AccuVet laser, in March of 1998, he received, from the Luxar Corporation, a single sheet description of how to perform a feline onychectomy using the laser (the "Luxar reference"). Young testified that it was his dissatisfaction with the technique described in the Luxar reference that caused him to begin experimenting to develop a new technique. Young appears to claim that the primary difference between his technique and the Luxar reference is that the Luxar reference does not provide for a first circumferential incision at the edge of the ungual crest. It is this first incision, Young argues, that allows him to retain the redundant epidermis (extra skin) to cover the wound. Olsen testified that the Luxar reference shows all of the steps of the patented method. The Court agrees with Young's testimony, however, that the Luxar reference does not provide for a first circumferential incision at the edge of the ungual crest and does not provide for the retention of skin to cover the wound.

### 2. Conclusions of Law

▉ The Court will consider Defendant's arguments for materiality in turn.[3]

---

**3.** Defendant, with its Post–Trial Inequitable Conduct Memorandum, provided the Court with a copy of the PTO's decision, dated September 8, 2004, granting Defendant's request for a reexamination of the '579 patent. The PTO found a substantial new question of patentability raised by, *inter alia*, the Luxar reference, noting that, "[t]here is a substantial likelihood that a reasonable examiner would consider the aforementioned teaching of the references important in deciding whether or not the listed claims of the Young patent are

The mere fact that the Luxar reference discloses a technique for performing a feline onychectomy with a laser—even if it discloses the only known technique for doing so—does not suffice to establish, by clear and convincing evidence, that the Luxar reference is material for purpose of an inequitable conduct claim. Pursuant to Rule 56, materiality requires more than that a reference describe the prior art; the reference must establish, alone or in combination with other references, a prima facie case of unpatentability or it must refute a position taken by the applicant. 37 C.F.R. § 1.56(b) (2004). Defendant has not clearly and convincingly established that the Luxar reference meets either standard.

Defendant's assertion that the Luxar reference "inspired" Young to develop his invention is not supported by the facts or by common sense. The Luxar reference inspired Young's invention only in the sense that it revealed the prior art to be unsatisfactory, thereby causing Young to believe that he could develop an improved procedure. Defendant's contention that the figures in the Luxar reference are strikingly similar to the figures in the '579 patent likewise does not suffice to establish materiality. Having now viewed multiple diagrams of a cat's claw and, more specifically, of a cat's claw undergoing an onychectomy, the Court can say with confidence that all such diagrams appear similar to some extent. The diagrams in the Luxar reference are not necessarily any more similar to the diagrams in the patent than the diagram in the Slatter 1985 reference, which was disclosed to the PTO. Both Slatter and Luxar indicate an essentially straight-line cut. Regardless, the

mere fact that the diagrams appear somewhat similar does not establish, by clear and convincing evidence, that the Luxar reference is material.

The Court acknowledges that the Luxar reference could be considered to be material, at least to some extent. Indeed, it is probably more relevant than the Slatter 1985 reference. The Court also acknowledges that it would be possible, on this record, to find some level of intent to deceive. Young did not provide a copy of the Luxar reference to his attorney. While the description of the prior art contained in the '579 patent at least arguably incorporates the information contained in the Luxar reference, disclosure of that reference would have been the preferable course of action. In weighing all of the relevant circumstances, however, the Court does not find inequitable conduct. Even the potential levels of materiality and intent involved do not compel such a conclusion. Any possible culpability from failing to disclose the Luxar reference does not warrant the extinguishment of Plaintiff's claim. The Court, therefore, declines to find inequitable conduct based on the Luxar reference.

## V. CONCLUSION

For the foregoing reasons, the Court **FINDS** no invalidating inequitable conduct.

**IT IS SO ORDERED.**

---

patentable." Defendant argues that this finding compels a conclusion that the Luxar reference is material. The Court disagrees. Even if the PTO's decision had been properly introduced as evidence before the Court, which it

was not, the PTO applied the reasonable examiner standard, which, as explained by the Court, *supra* at n. 1, is no longer the correct standard to use in assessing an inequitable conduct claim.